UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

DEBRA SLADE,                                          **REPORT AND**
                                                      **RECOMMENDATION**
                                    Plaintiff,

v.                                                    11-CV-00396(A)(M)

ALFRED UNIVERSITY,
                                    Defendant.

_____

Plaintiff, Debra Slade, a former employee of Alfred University ("Alfred"), alleges,

*inter alia*,  that Alfred interfered with and retaliated against her in violation of the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§1001–1461 ("Second Cause of

Action"), and the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§2601–2654

(Third Cause of Action). Complaint [1].[1]

This case has been referred to me by Hon. Richard J. Arcara for supervision of

pretrial proceedings [12].  Before me is Alfred's motion for summary judgment [22].[2]  Oral

argument was held on December 20, 2012 [31].  For the following reasons, I recommend that

Alfred's motion be granted in part and denied in part.


## BACKGROUND

Slade was employed  by Alfred since 1998, and during the relevant time period

worked as a Research Account Specialist in the Office of Sponsored Research ("OSRA").  Alfred's

_____

[1]        Bracketed references are to the CM/ECF docket entries.

[2]        In response to Alfred's motion for summary judgment, Slade has withdrawn her
remaining claims for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e-2000e-17
(Fourth Cause of Action),  and the Americans with Disabilities Act, 42 U.S.C. §§12101-12213 (First
Cause of Action).  Slade's Memorandum of Law [24-1], p. 1. Therefore, I recommend that this portion of
Alfred's motion be granted.

Statement of Undisputed Material Facts [22-16], ¶1; Slade's deposition transcript [26-1], pp. 12-13.[3]

Cori Burton and Terri Drake also worked in the OSRA as clerical employees. Alfred's Statement of Undisputed Material Facts [22-16], ¶5. Jeffry Porter became the Acting Director of the OSRA in May 2008, and was elevated to Director in January 2009, and as such, Slade's immediate supervisor. Id., ¶¶3-4, 6.

## Slade's Familiarity with FMLA Leave

Slade concedes that she was aware of the procedures for requesting leave under the FMLA, had read Alfred's FMLA policy, and had taken FMLA leave in the past. Blankopf Affidavit [22-1], Ex. B, p. 102, 104-05. For example, in 2001, Slade requested and was granted FMLA leaves for gallbladder surgery and bipolar disorder, and from April 3 to May 15, 2008 for hysterectomy surgery. Alfred's Statement of Undisputed Material Facts [22-16], ¶109; Slade's deposition transcript [26-1], p. 80.

## Slade's Attendance Issues

In early 2009, Kathleen Costello, Alfred's Interim Director of Human Resources Services, was contacted by Porter, who advised her that he was having attendance problems with Slade and Burton. Costello Affidavit [22-9], ¶5; Porter Affidavit [22-5], ¶¶14-15. According to Porter, among Slade's attendance problems was her being prone to asking for time off with little or

---

[3] The parties' familiarity with the allegations of the Complaint, as fully set forth in Judge Arcara' Decision and Order denying Alfred's motion to for partial dismissal [9], is presumed. My summary is limited to the facts presented in connection with Alfred's motion for summary judgment.

no advance notice.  Porter Affidavit [22-5], ¶19.  As an illustration of his issues with Slade, Porter

cites to a February 26, 2009 e-mail he sent to Costello, reporting that

> "Deb called in sick Monday with a 'swollen eye . . . maybe pink eye.'
> Monday I suggested she see a doctor, she called in Tuesday with pink
> eye again and reported that she 'did not have time on Monday' to see
> the doctor.  She came in Wednesday, complained of pink eye
> symptoms, informed me at lunch that 'she gave it a try, tried to stay
> the day, but had to leave.' Why? 'pressure in [her] chest' I suggested
> a visit to the doctor was in order . . . .  An hour later she was still
> here, and then soon informed me that she was leaving because she
> was 'dizzy and had a headache, maybe the flu.'  I asked her to take a
> few minutes to think about what was going on.  She e-mailed me a
> few minutes later that she was leaving.  By the time I opened the e-
> mail she was gone."  Porter Affidavit [22-5], ¶18, Ex. B.

Notwithstanding Slade's absences, on her performance appraisal for the period from

Summer 2008 through Spring 2009, she received a score indicating that she was exceeding position

requirements. [26-7], Depo. Ex. 10.  However, among the concerns noted was "excessive

absenteeism may interfere with continuity and priorities".  Id.

Although Burton allegedly began complying with Porter's instructions (Porter

Affidavit [22-5], ¶16), Slade allegedly did not, which prompted Porter to believe that a meeting

with Slade was necessary.  In his February 27, 2009 e-mail to Costello, Porter stated:

> "A meeting with Deb next week is in order. As I said yesterday, I did
> deny her impromptu request for time off yesterday afternoon and
> explained that I think she is away from work an inordinate amount of
> time, noting that she was out 80 days in 2008 and I don't see how that
> is gonna be okay in 2009, and that she and I need to discuss our
> respective expectation about the use of time off as an employee
> benefit relative to her duties and responsibilities for which she is
> compensated." [26-7], Depo. Ex. 103.

A March 4, 2009 meeting was conducted with Slade, Porter and Costello, that was

memorialized in a March 6, 2009 memorandum from Costello to Slade, stating in relevant part:

"Our intent was to express our concern about your record of absences and to clarify the intent of University policy in relation to benefit time.

Based on your explanation, I understand that it has been a difficult year for you personally, particularly regarding convalescence from medical procedures during 2008 requiring extended time off, and early in 2009 medical issues of members of your extended family and other personal issues that have created demands for your time away from work . . . .

Another topic of discussion that evolved during our conversation was a level of anxiety that you sometimes feel in the office or about coming to work. You cited changes in the structure of the office, realignment of duties, and unavoidable interruptions as possible factors that may contribute to your overall sense of well being at work, feelings about coming to work and ability to perform work, and just 'not feeling 100%'.

I emphasized that your absences require the support of your colleagues to cover your workload . . . . The University benefit time allotment is there to allow you to take time for yourself but also is available to take care of personal matters.  However, any scheduled time off, excused absences and no-pay days must be approved by your supervisor.

Your pattern of sick leave usage is higher than one would anticipate from an employee.  While your sick leave is available for you to take; we encourage employees to use sick leave sparingly should they need it to cover an extended unforeseen absence.  You experienced this dilemma first hand when you had no sick leave days accrued to use fro your absence related to your surgery.

Although it may be difficult to formulate a 'plan of action' we hope that you can examine your needs and reasons behind your absences to see if there are ways for you to cut down on unplanned absences.  Jeff confirmed his need of advance notice; preferably 2 weeks for scheduled appointments and the use of vacation time.  To alleviate the work place pressure you described a suggestion was to make a list

of issues that are problematic and determine ways to address them."
Costello Affidavit [22-9], Ex. A.[4]

Although the memorandum was signed by Slade, when asked whether this memo accurately reflected what was said to her, she testified, "I don't recall". [26-1], p. 167. According to Slade, she was "pretty sure" they also talked about her thyroid condition during this meeting. Slade's deposition transcript [26-1], pp. 168-69. Although Alfred states that she never submitted a "plan of action" (Alfred's Statement of Undisputed Material Facts [22-16], ¶20), Slade made handwritten notes on the bottom of memorandum stating, "more communication in office", "a need for cubicals [*sic*]" and "when e-mails get addressed to both Terri + I who is responsible", which she alleges was her plan. Costello Affidavit [22-9], Ex. A; Slade's Response to Alfred's Statement of Undisputed Material Facts [25], ¶20. While it would have been customary for Costello to have placed Slade on probation at the March 4, 2009 meeting, Costello testified that "because I did not make that statement to [her] during the meeting, then we actually started the probation later". Costello deposition transcript [26-6], p. 97.

According to Alfred, Slade's attendance-related problems continued:

■ On April 14, 2009, while Porter was absent, she sent an e-mail to Theresa Gunn, who was substituting for him, at 3:21 p.m. stating that she would "be leaving at 3:30 for a legal apt". Porter Affidavit [22-5], Ex. E. Contrary to what was indicated in her e-mail, Slade later informed Costello that she left work that day to deliver some documents to her insurance company.

_____

[4] In a February 24, 2009 e-mail from Costello to Porter, she provided him with sample language for his communications with Slade concerning her absences, which included certain FMLA advisements (*e.g.*, "Should there be some underlying health issue that qualifies you for Family Medical leave . . . don't hesitate to put in a request"). [26-7], Depo Exs. 93 and 94. Costello incorporated some of this sample language into her March 6, 2009 Memorandum, but did not include the FMLA advisements.

Alfred's Statement of Undisputed Material Facts [22-16], ¶28. Slade has since testified that the appointment was to pay her mechanic, and that her mechanic was open until 5:00 p.m., which she conceded would "[p]ossibly" have permitted her to leave at her regular time of 4:30 p.m. Blankopf Affidavit [22-1], Ex. B, pp. 181-82, 200.

■    On April 16, 2009 she verbally informed Porter that she was leaving a doctor's appointment and also requested to take a vacation day the following day.  Alfred's Statement of Undisputed Material Facts [22-16], ¶32.  Porter granted her request to leave for the doctor's appointment, but denied her request to take a vacation day for lack of sufficient notice.  Id., ¶33; Porter Affidavit [22-5], ¶25.  Nevertheless, Slade called in sick on April 17, 2009, but recorded it as a vacation day on her timesheet.  Alfred's Statement of Undisputed Material Facts [22-16], ¶¶34-36.


### Slade's Initial Probation

These incidents prompted Costello to send an April 17, 2009 e-mail to Slade "to re-emphasize" their March 4, 2009 conversation. Costello Affidavit [22-9], Ex. C.  Slade was advised that she was on a three-month probationary period, and that "abuse and/or misuse of sick and excused time are grounds for dismissal".  Id.  Slade requested clarification from Costello as to what was "expected of [her] or what are the guidelines during this 3 month probationary period."  Id., Ex. D.  Responding in an April 29, 2009 e-mail, Costello informed Slade that the expectation was that she would "abide by the policies in the handbook", including the requirement that "employees should schedule medical, dental, and optical appointments at times that do not interfere with their normal work schedule" and that "[w]hen this is not possible, employees must receive pre-

approval of such needed time off from their supervisor". Id. Costello's e-mail also indicated that it was expected that Slade's "absences and time away from the office will decline" and that her "performance issues need to be addressed in concert with the attendance issues". Id. She was further cautioned that "[i]f there are no changes from past performance dismissal may be justified". Id.

On July 10, 2009 Slade submitted written time off requests for an August 3, 2009 medical appointment and August 13-17, 2009 vacation, which were approved. [26-7]. In July 2009 Slade also discussed with Costello whether she could take FMLA leave in relation to her sister, but was informed that she could not. Costello deposition transcript [26-6], pp. 121-122.[5]

On July 24, 2009, Slade made a written request to take a week of vacation staring on July 27. Porter Affidavit [22-5], ¶29. Porter denied this request and informed her that she would need a doctor's note if she called in sick the next week. Alfred's Statement of Undisputed Material Facts [22-16], ¶¶43, 45. Slade did not report to work on Monday, July 27, 2009, and left Porter a voicemail reminding him that she was on vacation that week. Id., ¶47. This prompted Porter to call Slade and advise her that she needed to return to work on Tuesday. Id., ¶48. Slade complied. Id

**Slade's Final Written Warning**

At the conclusion of the initial three-month period of probation, Porter gave Slade a final written warning dated July 28, 2009, which placed her on probation for an additional 60 days. Porter Affidavit [22-5], Ex. H. It detailed many of the continued problems Porter believed existed

---

[5]     Slade concedes that the FMLA does not apply to leave taken because a sibling has a medical condition. Slade's Response to Alfred's Statement of Undisputed Material Facts [25], ¶111.

with Slade's absences.  Id.; Alfred's Statement of Undisputed Material Facts [22-16], ¶51.  He also

modified his prior performance evaluation, noting "[i]n hindsight, I realize that my desire to try to

find the best in you clouded by objectivity in providing those ratings.  Given my concerns, your

performance is not meeting my expectations and requires immediate and sustained improvement."

Porter Affidavit [22-5], Ex. H.

Coupled with Porter's Final Written Warning, a meeting was conducted with Slade,

Porter, Costello, and Linda White, Slade's union representative, to discuss its content.  Alfred's

Statement of Undisputed Material Facts [22-16], ¶52.  Slade was again counseled to put her time off

requests in writing and to give two weeks advance notice for an vacation or excused time requests.

Id., ¶54.  According to Alfred, at no time during this meeting did Slade indicate that she required

time off from work because she had any ongoing or episodic medical conditions.  Id., ¶55.[6]  This

meeting was summarized in an August 17, 2009 memorandum that was signed by Slade with a

handwritten note from her stating "a letter will be forthcoming regarding my interpretation of the

March 6, 2009 memo and the July 28, 2009 memo".  Costello Affidavit [22-9], Ex. F.  No such

letter was sent.  Alfred's Statement of Undisputed Material Facts [22-16], ¶61.  Following the

---

[6]        Slade denies this allegation in her Response to Alfred's Statement of Undisputed
Material Facts [25] and "refers to responses herein and . . . Slade dep. p. 85, lines 20-25".  Id., ¶55.  As
evidenced by the following excerpt, Slade's reliance on this aspect of her testimony is misplaced:

| 17. | "Q. | Okay. Would you turn to your response to Interrogator No. 9?" |
| 19. | "A. | Uh-huh." |
| 20. | "Q. | Okay. Are you claiming that you should have been given FMLA leave for your absence on July 28, 2009?" |
| 23. | "A. | Yes." |
| 24. | "Q. | You've written there, 'Full day to tend to father, who was hospitalized.'" Slade deposition transcript [26-1], p. 85, lines 17-25. |

meeting, White e-mailed Slade, stating "Just remember, communication is what Jeff needs - - document everything!" Blankopf Affidavit [22-1], Ex. D.

## Slade's Continued Absences

It appears that Slade's attendance issues temporarily subsided. In an e-mail dated August 11, 2009, Porter advised Mark Guinan, who became Alfred's Director of Human Resources Services in August 2009, that to date, Slade was "in compliance with the stipulations of [the Final Written Warning]". [26-7], Ex. 84. However, according to Alfred, these issues resurfaced.

On August 24, 2009 Slade sent Porter an e-mail at 2:23 p.m. stating, "Sorry for the last minute notice, but I have a medical apt. that I need to leave for. Hope you understand." Porter Affidavit [22-5], Ex. J. Whereas, Porter alleges that Slade never spoke to him in advance or obtained his prior approval (Porter Affidavit [22-5], ¶36)[7], Slade alleges that she made the appointment that day and had obtained Porter's approval that morning. Blankopf Affidavit [22-1], Ex. B, pp. 246, 253. In any event, Slade does not deny that during an August 25, 2009 meeting with Porter, he advised her that if she did this again, she would be fired. Slade's Response to Alfred's Statement of Material Facts [25], ¶67; Porter Affidavit [22-5], Ex. J.

Porter alleges that Slade continued to have various unplanned absences during the next two months. Porter Affidavit [22-5], ¶37. Slade does not dispute this, but notes that her absences were approved. Slade's Response to Alfred's Statement of Undisputed Material Facts [25], ¶71. According to Slade, on September 10, 2009, she called Porter to advise him that she

---

[7]    In response to Alfred's allegation in its Statement of Undisputed Material Facts that Slade did not tell Porter the reason for her medical appointment that day, she neither admits nor denies this, but instead cites to her deposition testimony (p. 106), which does not address this issue. Slade's Response to Alfred's Statement of Undisputed Material Facts [25], ¶65.

thought she had the flu, which was going around the office, and he advised her to stay home.

Blankopf Affidavit [22-1], Ex. B, p. 99.

On October 2, 2009, Slade did not show up for work and did not call in to report her absence. Porter Affidavit [22-5], ¶38. When Porter called her home to inquire, he was informed by Slade's husband that she was at the emergency room and would not be at work that day. Id. When Slade returned to work on October 5, 2009, she informed Porter that she had a sinus infection and dizziness on October 2, 2009. Alfred's Statement of Undisputed Material Facts [22-16], ¶74. Porter advised her to provide a note verifying that her absence was for medical reasons, and that her probationary period would end on October 22, 2009. Id. Slade provided an emergency room report for this absence. Porter's deposition testimony [26-4], pp. 106-7; Guinan Affidavit [22-3], ¶45, Ex. J. The emergency room report diagnosed Slade with "sinusitis with secondary headache". Guinan Affidavit [22-3], Ex. J.

On October 7, 2009, Slade called Drake, her co-worker, and informed her that she was having a "terrible headache" [26-7], Depo. Ex. 79. When Porter called Slade, her husband informed him that she had a headache and fever and would not be at work that day. Id. On her timesheet, Slade noted this absence as being "[w]ork related, noise, smell, temp." Porter Affidavit [22-5], Ex. L. The following day, Slade sought medical attention for a "headache, migraines". [26-7], Depo. Ex. 74. The medical record from that visit states that Slade:

> "was examined in [Jones Memorial Hospital emergency room]
> 10/02/09 for Dizziness, headaches that start in the back of her head
> and occasional feeling of SOB. Has been to her chiropractor for
> adjustments prior to going to the ER which she felt was a bit helpful.
> Was given zithromax in the emergency room as they felt she may
> have had a sinus infection, naproxen for the headache pain and
> Promethazine for nausea. Today woke up with same symptoms.
> Headaches occurs most days of the week recently. . . . Has had

> headaches on and off most of her life.  Usually has attributed her
> headaches to 'sinus infection' . . . . Has not felt well since headaches
> have been more problematic." <u>Id</u>.

Her assessment was "Migraine headache with aura.  History of bipolar disorder and anxiety." <u>Id</u>.

"[A] prophylactic medication for her migraines" was suggested, and Slade was started on Topamax and Imitrex.  <u>Id</u>.  A follow-up appointment was scheduled in four weeks.  <u>Id</u>.  According to Slade, she never had as many migraines as she experienced in 2009. Blankopf Affidavit [22-1], Ex. B, p. 83.  She appears to attribute this increase to construction work occurring at Alfred.  <u>Id</u>., p. 82.

Guinan was provided with the October 8, 2009 medical report.  Guinan deposition transcript [26-3], pp. 29-30.  Although he could not recall when he first saw it, Guinan assumed that it was in October 2009, and  he acknowledged that when he received it, he read it.  <u>Id</u>., p. 30, Slade's deposition transcript [26-1], pp. 122-23 (Slade provided the October 8, 2009 medical record "when they requested it").

On October 19, 2009, Porter sent an e-mail to all three OSRA employees, including Slade, reminding them of the importance of requesting time off in advance. Alfred's Statement of Undisputed Material Facts [22-16], ¶77.  That same date, Slade made a written request to take off two hours the next day for a dental appointment, which was approved.  [26-7], Depo. Ex. 76.

### Slade's Termination

A meeting was held with Porter, Guinan and Costello on October 26, 2009 to discuss whether Slade had met the terms of her probation.  Alfred's Statement of Undisputed Material Facts [22-16], ¶78.  Whereas Costello believed that Slade had been given more than enough time to demonstrate her compliance with Alfred's attendance rules, Porter stated that she had made some

progress and argued against terminating her.  Id., ¶¶81-82. Guinan sided with Porter and decided to extend her probation one more time.  Id., ¶83.

However, when this meeting concluded, Porter returned to his office to find an e-mail from Slade sent to him at 10:31 a.m., stating "Leaving to the a [*sic*] vet at my home. Will be in contact."  Porter Affidavit [22-5], Ex. N.  It is disputed whether Slade received Porter's prior oral approval that morning for this absence.  *Compare* Blankopf's Affidavit [22-1], Ex. B, pp. 259-60 (plaintiff alleges that she received permission to take an early or late lunch), Ex. G, pp. 50-51, *with* Porter Affidavit [22-5], ¶46.

Upon being advised by Porter a few minutes after their meeting of this incident, Guinan decided to reverse his earlier determination to extend Slade's probation, and instead terminate her.  Guinan Affidavit [22-3], ¶¶23, 24.  After Guinan obtained  approval from his supervisor, Giovina Lloyd, Vice President for Business and Finance, and discussing Slade's termination with White, a meeting was held with Porter, White, Guinan and Slade on October 27, 2009, at which Slade was terminated.  Id. ¶¶25-27.  Slade's termination was memorialized in a letter dated October 27, 2009 from Guinan, which cited the following eight examples of her unacceptable behavior:

> "1.    On Monday, August 3, 2009 (the first workday following the issuance of the Final Written Warning) you missed 3.5 hours.
>
> 2.    On Monday, August 24, 2009 you left two hours early and were given "unexcused" time off for that incident.
>
> 3.    On Thursday and Friday, September 13 and 14th you were out for two full days.
>
> 4.    On Friday October 2, 2009 you missed the entire workday and failed to call in for your absence.

5.      On Wednesday October 7, 2009 you again missed the full day.

6.      On Thursday, October 8, 2009 you missed two hours.

7.      On Tuesday, October 20, 2009 you again missed two hours.

8.      October 26, 2009 you left the University to meet with your Pet's
        Vet and left your Supervisor an e-mail telling him you were leaving."
        [26-7], Depo. Ex. 80.

Some of the instances cited in Slade's letter of termination were erroneous. For example, Slade had received written approval for her August 3, 2009 medical appointment three weeks in advance. Id., Depo. Ex. 77. Guinan conceded that he "erred in that case". Guinan deposition transcript [26-3], p. 44. He also conceded that the September 13 and 14, 2009 absences were intended to reference September 10 and 11, 2009. Id., p. 43. Slade also received advanced approval for the October 20, 2009 absence. [26-7], Depo. Ex. 76.

When asked whether the instances cited in his termination letter was the reason for Slade's termination, he testified "[n]o, they're not the reasons that she was terminated." Blankopf Affidavit [28-1], Ex. B, p. 42. According to Guinan, these were "examples of her problem behavior", and the reason for her termination was that "[s]he could not, for whatever reason, comply with our request for . . . scheduled absences . . . . she still failed to properly document, properly request, get permission to leave, this type of thing". Id., pp. 43-44. Both before and after Slade's termination, White had discussed Slade's work issues with the union's parent organization, Local 1000, and they were in agreement that there were no grounds on which to challenge Slade's termination or discipline. White Affidavit [22-11], ¶14.

## Slade's Alleged FMLA Qualified Absences

In her interrogatory responses (Blankopf Affidavit [22-1], Ex. E, Nos. 4, 8, 9), Slade identifies the following absences which should have been designated as protected absences under the FMLA:

| | |
|---|---|
| January 9, 2009 | "dental appointment for condition caused by acute sinusitus" |
| January 28, 2009 | "full day to tend to father who was hospitalized" |
| January 30, 2009 | "½ day to tend to father who was hospitalized" |
| February 23-24, 2009 | "influenza like symptoms caused by or related to acute sinusitis and/or migraines" |
| March 23, 2009 | "medical appointment for thyroid condition related to sinusitis and/or migraine" |
| April 9, 2009 | "medical appointment regarding sudden onset of ear pain and dizziness related to migraines and/or sinusitis" |
| April 16, 2009 | "follow-up medical appointment regarding onset of ear pain and dizziness related to migraines and/or sinusitis" |
| May 29, 2009 | "dental appointment for condition caused by acute sinusitis" |
| June 15, 2009 | "meeting with surgeon regarding thyroid condition caused by or related to acute sinusitis and/or migraines" |
| June 29, 2009 | "dental appointment for condition caused by acute sinusitis" |
| August 3, 2009 | "thyroid biopsy, condition related to acute sinusitis and/or migraines" |
| August 24, 2009 | "[r]eceived treatment . . . with Dr. William Koch for anxiety and bi-polar disorder" |
| September 10 and 11, 2009 | "influenza like symptoms caused by or related to acute sinusitis and/or migraines" |
| October 7, 2009 | "[r]eceived follow-up to emergency room treatment . . . with Dr. William Koch" |
| October 8, 2009 | "treated with Dr. William Koch regarding acute migraine/sinusitis" |
| October 20, 2009 | "dental appointment for condition caused by acutesinusitis", "[a]dmitted to emergency room . . . and was treated by Dr. L. Torphey for acute migraines and sinusitis" |

Many of the reasons alleged for these absences are not supported by the medical documentation or Slade's testimony. For example:

■  Slade testified that she believed that the January 9, 2009 dental visit was "a family thing. It didn't have anything to do with acute sinusitis. That was just a routine checkup, our usual dental exam". Blankopf Affidavit [22-1], Ex. B, p. 89.

■  Slade testified that no healthcare provider ever linked her February 23 and 24, 2009 absences to acute sinusitus and/or migraines. Id., pp. 99-100.

■  Slade testified that she had no idea what the doctor told her about the cause of her April 9, 2009 ear pain. Id., pp. 92-93.

■  Slade testified that the May 29, 2009 dental visit was "just a filling" , and when asked if sinusitus was involved in any way, she testified, "I have no idea. I don't know. Possibly." Id., p. 95.

■  The medical records from her August 24, 2009 visit indicate that Slade received treatment for a rash, not bipolar disorder or anxiety. Blankopf Affidavit [22-1], Ex. F.

■  Slade acknowledges that no healthcare provider has advised her that her thyroid condition is linked to her sinusitus or migraines. Blankopf Affidavit [22-1], Ex. B, pp. 98-99.

■  Slade acknowledges that no dentist has ever treated her for sinusitus. Id., p. 101.

■  The treatment record for the October 20, 2009 visit does not indicate that it was attributable to sinusitus or migraines. Blankopf Affidavit [28-1], Ex. D.

Alfred now moves for summary judgment, seeking to dismiss the Complaint in its

entirety.


## ANALYSIS

**A.       Summary Judgment Standard**

"Summary judgment is appropriate only if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits show that there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  The

party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact

exists.  In determining whether a genuine issue of material fact exists, a court must examine the

evidence in the light most favorable to, and draw all inferences in favor of, the non-movant.

Summary judgment is improper if there is any evidence in the record that could reasonably support

the jury's verdict for the non-moving party."  Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003).


**B.       Second Cause of Action:  ERISA Retaliation/Interference**

Section 510 of ERISA prohibits "any person to discharge, fine, suspend, expel,

discipline, or discriminate against a participant or beneficiary for exercising any right to which he is

entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with

the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C.

§1140.  "The term 'employee benefit plan" . . .  means an employee welfare benefit plan".  29 U.S.C.

§1002(3).  In turn, an "employee welfare benefit plan" is defined as:

"[A]ny plan, fund or program . . . established or maintained by an
employee or by an employee organization, or by both, to the extent that
such plan, fund, or program was established or is maintained for the
purpose of providing its participants or their beneficiaries [with] . . .
scholarship funds". 29 U.S.C. §1002(1).

Whereas Slade argues that "scholarship funds include plans such as the tuition

remission benefits program of Alfred University" (Slade's Memorandum of Law [24-1], p. 7), Alfred

argues that its "tuition remission benefit is not a funded program" subject to ERISA. Alfred's

Memorandum of Law [22-15], pp. 41-42. I agree with Alfred.

"[A]n employee benefit program *not* funded through a separate fund is not an ERISA

plan." California Division of Labor Standards Enforcement v. Dillingham Construction, N.A., Inc.,

519 U.S. 316, 326 (1997) (emphasis in original). Consistent with this principle, regulations have

been promulgated, stating that an "'employee welfare benefit plan' . . . shall not include a

scholarship program, including a tuition and education expense refund program, under which

payments are made solely from the general assets of an employer or employee organization". 29

CFR §2510.3-1(k).

Significantly, Slade does not dispute that Alfred "does not set aside any money . . . to

finance tuition remission awards" (Lloyd Affidavit [22-7], ¶10), and that when tuition remission is

awarded, "the student's Alfred tuition bill is simply credited with the tuition remission award", with

"[n]o money chang[ing] hands". Id., ¶11. *See* Slade's Response to Alfred's Statement of

Undisputed Material Facts [25], ¶¶164-65. In fact, even Slade acknowledges that "the source of

financing for the program is Alfred University's general operating revenues". Slade's Memorandum

of Law [24-1], pp. 6-7. Therefore, I conclude that Alfred's tuition remission plan is not subject to

ERISA, and recommend that Slade's Second Cause of Action be dismissed on this basis.

**C.      Third Cause of Action:  FMLA Interference/Retaliation**

"The FMLA entitles eligible employees to take up to twelve weeks of leave per year in order to care for a spouse, parent, or child of the employee that has a serious health condition or for the employee's own 'serious health condition that makes the employee unable to perform the functions of [her] position.'" Yanklowski v. Brockport Central School District, 2011 WL 2473098, *1 (W.D.N.Y. 2011)(Larimer, J.) (*quoting* 29 U.S.C. §§2612(a)(1)(c), (a)(1)(D), (b)).  "Three kinds of leave are available to employees with a serious health condition: (1) one block of leave of twelve weeks or fewer; (2) intermittent leave, which means 'leave taken in separate periods of time due to a single illness or injury . . . and may include leave of periods from an hour or more to several weeks'; and (3) reduced leave schedule, a plan under which the employer reduces the employee's normal work hours, usually to a part-time basis." Hoffman v. Professional Med Team, 394 F.3d 414, 418 (6th Cir. 2005).

Under the FMLA, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter".  29 U.S.C. §2615(a)(1).  The FMLA also makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter", 29 U.S.C. §2615(a)(2), or "for any person to discharge . . . any individual because such individual . . . has filed any charge, or has instituted or caused to be instituted any proceeding, under or related to this subchapter".  29 U.S.C. §2615(b).  "The Second Circuit recognizes a distinction between claims which allege a violation of §2615(a)(1)—so-called 'interference' claims—and claims which allege violations of §2615(a)(2) and (b), which are called 'retaliation' claims." Voltaire v. Home Services Systems, Inc., 2011 WL 4710852, *13  (E.D.N.Y. 2011).  Slade asserts both

retaliation and interference claims.  Before addressing the merits of these claims, I must determine their scope.

1.      **Scope of Slade's Claim**

      a.      **Timeframe**

"Claims brought under the [FMLA] are subject to a two-year statute of limitations (or three years if the defendant acted wilfully)."  <u>Abrams v. Bloomberg, L.P.</u>, 2012 WL 4783014, *3 (S.D.N.Y. 2012) (*citing* 29 U.S.C. §§2617(c)(1)-(2)).  It is undisputed that Slade filed this case on May 9, 2011.  Alfred argues that Slade "has no evidence of any FMLA violation, let alone that [it] acted 'willfully' to deny her FMLA benefits.  Therefore, she may assert FMLA claims only as far back as May 9, 2009".  Alfred's Memorandum of Law [22-15], p. 21.  Slade responds that  she is entitled to the three year statute of limitations, arguing that "she was willfully subjected to a campaign of retaliation".  Slade's Memorandum of Law [24-1], p. 14.

Although "[t]he term 'willful' is not specifically defined in the FMLA"  <u>Porter v. New York University School of Law</u>, 392 F.3d 530, 531 (2d Cir. 2004), courts have held that an employer acts willfully when it "'knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FMLA].'"  <u>Id</u>. (*quoting* <u>McLaughlin v. Richland Shoe Co.</u>, 486 U.S. 128, 133(1988)).  *See* <u>Mahran v. Benderson Development Co., LLC</u>,  2011 WL 1467368, *3-4 (W.D.N.Y.), <u>recon</u>. <u>denied</u>, 2011 WL 2038574 (W.D.N.Y. 2011) (Arcara, J.).  By contrast, "'[i]f an employer acts unreasonably, but not recklessly, in determining its legal obligation, then . . . it should

not be . . . considered willful.'" Id. at 531-32 (quoting McLaughlin, 486 U.S. at 135 n. 13).[8]

For the reasons that follow, I need not resolve this issue since even applying the two-year statute of limitations sought by Alfred , I would deny this portion of its motion.

### b.  Slade's Ailments

Alfred argues that Slade's claims are limited to the allegations of the Complaint, which do not reference her thyroid condition.  Alfred's Reply Memorandum of Law [28], p. 3.  I agree.  "It is black letter law that a party may not raise new claims for the first time in opposition to summary judgment." Brandon v. City of New York, 705 F.Supp.2d 261, 278 (S.D.N.Y. 2010).  In addition to Slade's thyroid condition not being mentioned in her Complaint, she testified that no healthcare provider has indicated that this condition is related to her sinusitus or migraines. Blankopf Affidavit [22-1], Ex. B. pp. 98-99.

Therefore, I will disregard Slade's allegations raised in opposition to Alfred's summary judgment motion that she requested, but was denied FMLA protected leave for her thyroid condition.  See Lyman v. CSX Transportation, Inc., 364 Fed.Appx. 699, 702 (2d Cir. 2010) (Summary Order) ("we cannot conclude that the district court abused its discretion in failing to consider plaintiff's new theories of liability"); Fullwood v. Association for the Help of Retarded Children, Inc., 2010 WL 3910429, *7 (S.D.N.Y. 2010).

---

[8]       It is unclear which party bears the burden on this issue. Compare  Katoula v. Detroit Entertainment LLC,  2012 WL 6088325, *2 (E.D.Mich. 2012) ("it is Plaintiffs' burden to establish that Defendant willfully violated the FMLA"); Avent v. Kraft Foods Global, Inc.,  2012 WL 3555378, *4 (E.D.Va. 2012) ("Plaintiff has not met her burden of showing that Kraft's alleged conduct was willful under the FMLA in order to extend the limitations period to three years") with Shalley v. Fleet Credit Card Services, LP, 2003 WL 22100858, *2  (E.D.Pa. 2003) ("'the statute of limitations is an affirmative defense, and the burden of establishing its applicability to a particular claim rests with the defendant'").

## 2.     FMLA Interference

"In order to state a *prima facie* claim for interference under the FMLA, plaintiff must demonstrate that (1) he was an eligible employee under the FMLA; (2) defendant is an employer under the FMLA; (3) plaintiff was entitled to leave under the FMLA; (4) plaintiff gave notice to defendant of his intention to take leave; and (5) plaintiff was denied benefits to which he was entitled under the FMLA." Yanklowski, 2011 WL 2473098 at *1.  Additionally, "a plaintiff must show that she was somehow prejudiced by Defendant's failure to designate her disability leave as FMLA leave for Defendant to be liable".  Gilmore v. University of Rochester, 654 F.Supp.2d 141, 150 (W.D.N.Y. 2009) (Larimer, J.).  "An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." Callison v. City of Philadelphia,  430 F.3d 117, 120 (3d Cir.), cert. denied, 546 U.S. 876 (2005).

Alfred does not dispute that Slade was an eligible employee under the FMLA or that it is an employer under the FMLA.  However, it disputes whether Slade can demonstrate the balance of her *prima facie* showing, and whether she was prejudiced by Alfred's misclassification of her absences.  Alfred's Memorandum of Law [22-15], pp. 21-28.


### a.     Was Slade entitled to FMLA Leave?

"The term 'serious health condition' means an illness, injury, impairment, or physical or mental condition that involves . . . inpatient care in a hospital, hospice, or residential medical care facility; or . . . continuing treatment by a health care provider." 29 U.S.C. §2611(11).   Continuing treatment includes "any period of incapacity due to a chronic serious health condition. 29 CFR §825.115(c). A "chronic serious health condition" is defined as one which "(1) Requires periodic

visits (defined as at least twice a year) for treatment by a health care provider, or by a nurse under direct supervision of a health care provider; (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and (3) May cause episodic rather than a continuing period of incapacity (*e.g*., asthma, diabetes, epilepsy, etc.).” <u>Id</u>.

      “The term treatment includes (but is not limited to) examinations to determine if a serious health condition exists and evaluations of the condition. Treatment does not include routine physical examinations, eye examinations, or dental examinations. A regimen of continuing treatment includes, for example, a course of prescription medication (e.g., an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition (e.g., oxygen). A regimen of continuing treatment that includes the taking of over-the-counter medications such as aspirin . . . and other similar activities that can be initiated without a visit to a health care provider, is not, by itself, sufficient to constitute a regimen of continuing treatment for purposes of FMLA leave.” <u>Id</u>. §825.113(c). “Ordinarily, unless complications arise, the common cold, the flu, ear aches, upset stomach, minor ulcers, headaches other than migraine, routine dental or orthodontia problems, periodontal disease, etc., are examples of conditions that do not meet the definition of a serious health condition and do not qualify for FMLA leave.” <u>Id</u>., §825.113(d).

      According to Alfred, Slade “has not established that either her alleged sinusitis or chronic migraines were serious health conditions”, since “[i]n 2009 she experienced only a single day of absence caused by each condition, not episodic absences.” Alfred’s Memorandum of Law [22-15], pp. 23-24. I disagree.

      As set forth above, many of Slade’s alleged FMLA qualified absences have no connection to her sinusitus or migraines. However, on October 2, 2009 Slade was diagnosed at the

emergency room with "sinusitis *with secondary headache*". Guinan Affidavit [22-3], Ex. J (emphasis added). She was then diagnosed with migraines on October 8, 2009, which the medical record indicates was a recurring issue. [26-7], Ex. 74. Coupled with Alfred's receipt of these medical records, when asked if he was aware if Slade suffered from migraines, Porter testified that "[s]he had stated that her reason for absences, were, from time to time, migraines". Porter's deposition transcript [26-4], p. 17.

Additionally, Alfred itself recognized that Slade's "pattern of sick leave usage [was] higher than one would anticipate from an employee". Costello Affidavit [22-9], Ex. A. Giving Slade the benefit of every favorable inference as the non-movant, I conclude that there is a triable issue of material fact as to whether Slade suffered from a chronic serious health condition. *See* Strohl v. Brite Adventure Center, Inc., 2009 WL 2824585, *6 (E.D.N.Y. 2009) (finding that a triable issue of material fact existed as to whether plaintiff suffered from a chronic serious health condition, where she "'made at least 50 doctor visits over the last 8 years due to [her] condition and ha[s] had more than 10 prescriptions for different medications'" and "the record . . . includes a letter from plaintiff to her site manager stating that she experiences 'severe' and 'chronic migraine headaches' . . . and a doctor's note stating that plaintiff 'was home sick with a migraine headache today'").

**b.       Did Slade Provide Alfred with Sufficient Notice?**

Alfred argues that Slade failed to provide it "with sufficient information to implicate the FMLA". Alfred's Reply Memorandum of Law [28]. I disagree.

"In order to be protected by the FMLA, an employee must provide the employer with appropriate notice of an absence." <u>Golden v. New York City Department  of Environmental Protection</u>, 354 Fed.Appx. 577, 578-579 (2d Cir. 2009) (Summary Order).  The employee need not make an express assertion of FMLA rights.  However, "[a]n employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA—qualifying leave, and the anticipated timing and duration of the leave . . . .  When an employee seeks leave for the first time for a FMLA–qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA." 29 CFR §825.302(c).  "'The critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition.'"  <u>Mann v. Mass. Correa Electric, J.V.</u>, 2002 WL 88915, *7  (S.D.N.Y. 2002).  *See* <u>Miller v. Venator Group, Inc.</u>, 2000 WL 648186, *2 (S.D.N.Y. 2000) ("An employee need not expressly assert rights under the FMLA or even mention the FMLA when requesting leave, but may state only that leave is needed because of a serious health condition"); <u>Slaughter v. American Building  Maintenance Co. of New York</u>, 64 F.Supp.2d 319, 325 (S.D.N.Y. 1999) ("It is notice of the qualifying reason for leave, and not notice of the FMLA basis for that leave, that must be communicated").  "While an employee's statements may give rise to a duty on the part of the employer to inquire into the nature of the employee's need for leave, the employer is not required to be clairvoyant." <u>Slaughter</u>, 64 F.Supp.2d at 326.

"Once an employee has given adequate notice of the existence of a serious health need, the employer bears the burden of inquiring further to determine whether the requested leave qualifies for FMLA protection." <u>Mann</u>, 2002 WL 88915 at *7.  *See* <u>Manuel v. Westlake Polymers Corp.</u>, 66 F.3d 758, 764 (5th Cir. 1995) ("The Act permits  employers notified of an employee's

intent to take leave due to a serious health condition to require the employee to provide certification from a physician").

Here, it is undisputed that Guinan was provided with Slade's October 8, 2009 medical treatment record. [26-7], Ex. 74. "[A] doctor's note may provide the employer with sufficient notice." Colombo v. East Irondequoit Central School, 2008 WL 4516235, *3 (W.D.N.Y. 2008) (Siragusa, J.). Although a doctor's note that fails to "convey the seriousness of her medical condition" does not constitute sufficient notice (de la Rama v. Illinois Department of Human Services, 541 F.3d 681, 687 (7th Cir. 2008)), that cannot be said of the October 8, 2009 treatment record, which details Slade's history of reoccurring headaches, diagnosed her with migraines for which she was prescribed medications, and scheduled a follow-up appointment. [26-7], Ex. 74. Moreover, "from time to time", Slade informed Porter that her absences were attributable to migraines. Porter deposition transcript [26-4], p. 17.

I recognize that "the 'FMLA does not require employers to play Sherlock Holmes'" Basso v. Potter, 596 F.Supp.2d 324, 339 (D.Conn. 2009) (*quoting* de la Rama, 541 F.3d at 687) or "to be clairvoyant". Slaughter, 64 F.Supp.2d at 326. Nevertheless, a reasonable jury could conclude that great powers of observation and deduction were not required to discern that at least some of Slade's absences may be attributable to a chronic serious health condition, thereby triggering Alfred's obligation to at least make further inquiry, including requesting a certification, if it had any doubts.

c.      **Was Slade Prejudiced by Any Misclassification of her Absences?**

Alfred argues that Slade "cannot establish that her employment was terminated because some of her many absences had not been designated as FMLA leave." Alfred's Memorandum of Law [22-15], p. 27. This argument is difficult to reconcile with the fact that Slade's termination letter identified eight examples of "unacceptable behavior", three of which were her absences on October 2, 7, and 8, 2009. [26-7], Depo. Ex. 80. *See* Barnett v. Revere Smelting & Refining Corp., 67 F.Supp.2d 378, 388 (S.D.N.Y. 1999) ("a termination based only in part on an absence covered by the FMLA, even in combination with other absences, may still violate the FMLA"). Therefore, I conclude that there is a triable issue of material fact as to whether Slade was prejudiced by the misclassification of her absences.

3.      **FMLA Retaliation**

"Unlike interference claims, . . . retaliation claims under the FMLA are subject to the *McDonnell Douglas* burden shifting analysis. . . . In order to show a *prima facie* case, [plaintiff] must show (1) she exercised rights protected under the FMLA; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." Pearson v. Unification Theological Seminary, 785 F.Supp.2d 141, 162-63 (S.D.N.Y. 2011) (*citing* Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004)). *See* Serby v. New York City Department of Education, 2013 WL 2150807, *1 (2d Cir. 2013) (Summary Order) ("We have analyzed retaliation claims pursuant to the FMLA under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)"). An inference of retaliatory intent "can be established when there is a basis

for a jury to conclude that "a causal connection exists between the plaintiff's protected activity and the adverse action taken by the employer." Donnelly v. Greenburgh Central School Dist. No. 7, 691 F.3d 134, 152 (2d Cir. 2012).

In seeking dismissal of this claim, Alfred argues, *inter alia*, that Slade "cannot show that [it] retaliated against her because she did not exercise any rights protected by the FMLA in the entire year preceding her termination." Alfred's Memorandum of Law [22-15], p. 29. Slade responds that "it is undisputed [she] took an FMLA protected leave in 2008" and "that the 2008 FMLA leave was the main factor in disciplining Plaintiff in 2009". Slade's Memorandum of Law [24-1], p. 15. Alfred replies that plaintiff did not plead that she was retaliated against for taking FMLA leave in 2008. Alfred's Reply Memorandum of Law [ 28], p. 4. I agree with Alfred, and will not consider this newly raised theory of retaliation. *See* Brandon, 705 F.Supp.2d at 278.

In any event, Slade also argues in opposition to Alfred's motion to dismiss her retaliation claims that her "absences in 2009 that should have been counted as FMLA were used as a reason to discipline and terminate [her]." Slade's Memorandum of Law [24-1], p. 16. Slade's failure to expressly invoke her FMLA rights does not preclude her claim of retaliation. *See* McNamara v. Trinity College, 2013 WL 164221, *4 (D.Conn. 2013) ("this Court adopts the view that a theory of FMLA retaliation may be based on proof of a plaintiff's inquiry notice to his employer that he was requesting potentially FMLA - qualifying leave, even though he may have been unaware of the FMLA's application to his request, so long as the employer had knowledge that the requested purpose likely qualified for FMLA protection"). "Plaintiff will need to prove that he took de facto FMLA leave to which he was entitled, that Defendant knew or should have known of his likely eligibility, and that Defendant nonetheless fired him for taking his likely protected leave. If

however, Plaintiff gave some indication that he did not intend to invoke the FMLA, his retaliation claim will fail." Id., *5.

Alfred argues that Slade "cannot establish a causal connection between any FMLA - protected activity and her termination, she cannot show that Alfred's reasons for terminating her employment were a pretext for retaliation under the FMLA". Alfred's Memorandum of Law [22-15], p. 30. I disagree. As discussed above, there are triable issues of material fact as to whether Alfred should have known that some of her 2009 absences were FMLA qualified. It is also evident from Slade's termination letter that some of these absences contributed to her termination.

There also exist triable issues of material fact as to whether there were legitimate non - discriminatory reasons for her termination. Although Alfred argues that "[i]t is undisputed that, had she not left without warning again on October 26, 2009 Alfred would have continued her employment" and that "[u]nder these circumstances, [it] is entitled to summary judgment dismissing her FMLA retaliation claim" (Alfred's Memorandum of Law [22-15], pp. 30-31), Slade and Porter present different versions of events as to whether Slade had prior permission for this absence, which cannot be resolved on this motion. *Compare with* Williams v. New York City Health & Hospitals Corp., 2012 WL 5506128, *6 (S.D.N.Y. 2012) ("Even if plaintiff could make out a *prima facie* retaliation claim based on the timing of his final request for intermittent FMLA leave, defendants have put forward extensive evidence of legitimate, non-discriminatory reasons for his termination. The same history of excessive absenteeism and lateness, the multiple instances of discipline for that conduct, and plaintiff's violation of the last chance agreement provide an entirely one-sided record in this regard").

## CONCLUSION

For these reasons, I recommend that Alfred's motion for summary judgment [22] be granted to the extent it seeks dismissal of Slade's First, Second and Fourth Causes of Action, but otherwise be denied. Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by August 26, 2013 (applying the time frames set forth in Fed. R. Civ. P. ("Rules") 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

Dated: August 9, 2013

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge